**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA ARROYO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 9146** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Patricia Arroyo ("Arroyo" or "claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Arroyo's claim for Disability Insurance Benefits under Sections 216 and 223 of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(l) and 423(d), and her claim for Supplemental Security Income under Section 1614(a)(3)(A) of the Act, 42 U.S.C. § 1382a(a)(3)(A). The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted.

### I. BACKGROUND

_____

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

## A. Procedural History

On February 22, 2010, claimant filed an application for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") due to a fractured disc and severe back pain.  (R. 192, 199, 219).  The Social Security Administration initially denied her claims on May 12, 2010, and upon reconsideration on August 4, 2010.  (R. 105-08, 120.)  Arroyo filed a timely request for a hearing, and on April 19, 2011, she appeared before ALJ Helen Cropper. (R. 39.)  On August 11, 2011, the ALJ issued a written decision denying Arroyo's request for benefits.  (R. 14-33.)  Arroyo filed a timely request for review, and on September 18, 2012, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner.  (R. 1); *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); 20 C.F.R. § 416.1481.  Arroyo subsequently filed this action.

## B. Medical Evidence

### 1.  Su Salud Medical Center and MacNeal Hospital

Prior to her alleged onset date, Arroyo was treated for several ailments at Su Salud Medical Center and MacNeal Hospital.  At Su Salud, she was under the care of Dr. Sylvia Juarez.  Claimant was initially treated at Su Salud for headaches and abdominal pain.  (R. 400-20.)  As part of her treatment for abdominal pain, claimant underwent a CT scan in April 2009 that disclosed a small ventral hernia, or bulging of the abdominal wall.  (R. 466.)  On February 20, 2009, Arroyo underwent a sleep study at MacNeal Hospital.  (R. 332-33.)  The results of this study showed no abnormalities.  (*Id.*)  Arroyo was diagnosed with unspecified hypersomnia and snoring.  (R. 356.)

On April 15, 2009, Arroyo visited the emergency room at MacNeal, where a CT of the abdomen and pelvis was performed. (R. 343.) This test revealed a punctate density within the left lung base that appeared noncalcified. (*Id.*) It also revealed that pelvic structures were within normal limits, there was no evidence of appendicitis, and there was a small ventral hernia just above the umbilicus. (*Id.*) Arroyo saw Dr. Juarez on November 18, 2009, complaining of pelvic pain, headaches, vomiting, and a rash. (R. 421.) Dr. Juarez diagnosed sciatica and morbid obesity and prescribed naproxen. (*Id.*) On January 20, 2010, Arroyo had an MRI of the lumbar spine. (R. 345.) The radiology report noted that she had suffered from pelvic pain for six years. (*Id.*) The MRI revealed a small but broad-based central disc protrusion resulting in effacement of the anterior thecal sac at L4-5. (*Id.*) There was no malalignment of the lumbar spine and the vertebral body heights were well-maintained. (*Id.*) There was no spinal canal stenosis and the neural foramina were "grossly patent bilaterally." (*Id.*)

On February 4, 2010, Arroyo visited Dr. Juarez again and complained of headaches, dizziness, blurred vision and vomiting. (R. 420.) Dr. Juarez diagnosed claimant with cervical radiculopathy, a herniated disc and obesity. (*Id.*) She also noted that Arroyo's reflexes were positive and her strength was 3.5/5. (*Id.*) She referred Arroyo to a pain clinic and ordered an MRI, which showed a "subtle central disc bulge" that caused some narrowing of the spinal canal. (R. 344-46, 420.)

Claimant visited the emergency room at MacNeal again on February 10, 2010, complaining of frequent urination. (R. 349.) The report states that she had no other complaints. (*Id.*) She was diagnosed with a urinary tract infection, and she was prescribed medication. (R. 350.)

On February 15, 2010, the date of alleged onset of disability, claimant saw Dr. Juarez for a headache, neck pain, wrist pain, and lower back pain. (R. 423.) Dr. Juarez again referred her to a pain clinic, as well as a bariatric clinic, neurologist, and ear, nose, and throat specialist. (*Id.*) Dr. Juarez noted that Arroyo's strength was 3/5, she had a herniated disc at L5, she was obese and had cervical radiculopathy. (*Id.*) Claimant went to Su Salud on February 18, 2010 complaining of immense pain, and she was promptly sent to the emergency room by ambulance. (R. 422.)

On March 17, 2010, Dr. Juarez filled out a medical questionnaire listing claimant's conditions as severe low back pain, herniated lumbar disc, and radiculopathy, with weakness in the lower extremities. (R. 605.) In this form, Dr. Juarez noted that Arroyo was unable to sit, stand, or lie down for a long period of time, and that she used a cane to walk. (*Id.*) Dr. Juarez also noted that claimant continued to need assistance with activities of daily living. (*Id.*) Dr. Juarez described claimant's prognosis as poor. (R. 605–06.) She opined that claimant was not able to work a full-time job because she was in constant pain, unable to maintain concentration, and unable to sit or stand for more than fifteen minutes. (R. 606.)

On April 15, 2010, Arroyo again complained to Dr. Juarez of severe back pain. (R. 425.) Claimant informed Dr. Juarez that she was only using Advil to manage her increasing back pain. (*Id.*) She reported that the pain is radiating to her leg and she is unable to sit. (*Id.*) Dr. Juarez noted that the examination of Arroyo was positive for tenderness and weakness, and she also indicated a decrease in sensation. (*Id.*) Dr.

Juarez advised claimant to follow up at the pain clinic at Loyola and she wrote her a prescription for Norco.  (*Id.*)

On April 22, 2010, Arroyo had a chest exam, which showed normal results with no evidence of chest disease.  (R. 340.)  On May 7, 2010, Arroyo complained of abdominal pain, radiating back pain and a heavy feeling in her right leg.  (R. 426.)  She also told Dr. Juarez that she had difficulty sitting or standing up, and that she was not obtaining relief from the Norco she was prescribed.  (*Id.*)  (In fact, it appears that she never filled this prescription.  (R. 305-07.))  She reiterated the same complaints at a subsequent appointment on May 21, 2010.  (R. 428.)

Claimant saw Dr. Juarez again on June 22, 2010 and reported headaches and dizziness, as well as numbness in both legs.  (R. 607.)  Dr. Juarez prescribed medication for what she diagnosed as a migraine headache, but again this prescription was apparently never filled.  (R. 305–07, 607.)  She noted that Arroyo's pain was a 9/10 and her back pain continued to radiate down her right leg, causing numbness.  (R. 607.)

On July 16, 2010, claimant saw Dr. Juarez, again complaining of headaches, nausea, and abdominal pain and tenderness.  (R. 608.)  She also noted fatigue and poor appetite.  (*Id.*)  With regard to her back, she reported some improvement as a result of epideral steroid injections.  (*Id.*)  Dr. Juarez noted that Arroyo was taking Norco for her pain (although again, it appears the prescription was not filled).  (*Id.*)  She also prescribed Zantac for acid reflux disease and Imitrex for migraines, although neither prescription was filled.  (R. 305–07)

On August 13, 2010, claimant reported to Dr. Juarez that the headaches she had experienced had worsened in the past two months. (R. 609.) She also reported abdominal bloating, back pain, and episodes of incontinence. (*Id.*) Medications listed in Dr. Juarez's notes from this appointment included Cyclobenzaprine, Imitrex, Zantac, and Tylenol/Advil. (*Id.*) Arroyo also told Dr. Juarez that she was not benefitting from physical therapy. (*Id.*) Dr. Juarez ordered a pelvic ultrasound. (*Id.*)

On August 27, 2010, claimant again reported to Dr. Juarez that her headaches were worsening, making it difficult for her to sleep. (R. 610.) Dr. Juarez's notes refer to Arroyo's cane, her obesity and her back pain. (*Id.*) On September 14, 2010, claimant complained to Dr. Juarez that she had a sore throat, cough and difficulty swallowing. (R. 611.) On September 15, 2010, claimant went to the emergency room complaining of cough, congestion, and associated chest pain, and was wheezing when examined. (R. 519-20.) Arroyo had no other complaints at this visit. (R. 520.) She was diagnosed with acute bronchitis and given prescriptions for an antibiotic, immunosuppressant, expectorant, and inhaler (none of which appear to have been filled). (*Id.*; R. 305-07.)

Claimant went to see Dr. Juarez again on November 12, 2010 and complained of headaches, back pain, nausea, and shortness of breath. (R. 613.) She claimed to have recently run out of two prescriptions (Cyclobenzaprine and Gabapentin) that she apparently had never previously filled. (R. 305–07, 613.) Dr. Juarez ordered a chest x-ray and cardiac tests and prescribed Imitrex, and more Cyclobenzaprine and Gabapentin; these prescriptions were actually filled. (*Id.*)

Claimant saw Dr. Juarez on December 10, 2010, complaining of back pain and abdominal pain. (R. 615.) Dr. Juarez noted increased sensation with continued

weakness in the right leg.  (*Id.*)  She again prescribed Cyclobenzaprine and Gabapentin and told claimant to follow up with the pain clinic.  (*Id.*)

Claimant visited Dr. Juarez on February 4, 2011, complaining of headaches, nausea, vomiting, abdominal and neck pain, and night sweats.  (R. 617.)  She reported an inability to do housework or sit or stand for any significant length of time due to continued pain.  (*Id.*)  She required assistance with daily activities such as getting dressed, bathing, and grooming.  (*Id.*)  Dr. Juarez noted that Arroyo has had four epideral steroid injections but continues to have pain and cannot sit or stand for more than five or ten minutes.  (*Id.*)  Dr. Juarez again prescribed Cyclobenzaprine, Gabapentin, Zantac, and Imitrex.  (*Id.*)

On March 17, 2011, claimant visited Dr. Juarez again and reported that she was taking Gabapentin and Norco for her symptoms, which had not improved, despite a recent steroid injection.  (R. 618.)  She told Dr. Juarez that she still walked with a cane and had difficulty sitting for longer than five minutes, and that she was having trouble sleeping.  (*Id.*)  Dr. Juarez wrote new prescriptions for Gabapentin and Norco.  (*Id.*)

On January, 27, 2012, Dr. Juarez filled out a second medical questionnaire about Arroyo's condition.  (R. 719.)  She noted that Arroyo had been diagnosed with a herniated lumbar disc with severe radicularity pain with a supporting MRI showing L4-5 broad disc bulge.  (*Id.*)  She also noted that Arroyo suffered from major depression. (*Id.*)  She described Arroyo's symptoms as severe pain associated with numbness in the lower extremities and weakness, stiffness and spasm of back and leg muscles.  (*Id.*) She further noted that Arroyo needs a cane to walk and support for standing, she is unable to lift, push or pull greater than five pounds, and she is unable to stoop, sit, stand

or lay down for prolonged periods due to her pain. (*Id.*) She stated that Arroyo's prognosis was poor and she opined that Arroyo could not work because she is "unable to stay in one position while in the office interview," and "unable to maintain lifting a gallon of milk for longer than a few seconds due to severe pain." (R. 719.)

### 2. Loyola University Emergency Department and Pain Clinic

On February 18, 2010, Arroyo went to the Emergency Department at Loyola University Medical Center. (R. 373.) She was examined by Dr. Hank Graziano, who noted that she suffered from "exacerbated" chronic lower back pain. (*Id.*) According to his report, Arroyo stated that she had worsening pain in her left back, which radiates into the left side of her abdomen and down her left leg. (R. 374.) Arroyo also noted that she feels short of breath and has some discomfort in her chest, and that her pain is worse when she is sitting or standing, or with movement. (*Id.*) Dr. Graziano prescribed Norco for pain management and recommended rehabilitation therapy. (R. 375, 383.) He also noted that Arroyo could return to work on March 1, 2010, without restrictions. (R. 376.) Again, claimant never filled these prescriptions. (R. 305-07).

On February 24, 2010, claimant went for an evaluation at the Loyola University pain management clinic, complaining of numbness and tingling in her toes and incontinence. (R. 385–87.) She was examined by Dr. Kristin Grau. (*Id.*) Arroyo complained of pain radiating from her lower back down the posterial left leg to her knee. (R. 385.) She stated that her pain started four days after she was hit by a parked car that another driver had hit, which then ran into her. (*Id.*) She also told Dr. Grau that she had been taking Norco and ibuprofen with no relief. (*Id.)* Dr. Grau's physical

examination revealed a positive single leg raise, no tenderness and no joint swelling, normal muscle tone, decreased sensation, no edema, and her left lower extremity was abnormal. (R. 386.) At the time of this examination, Arroyo was 261 pounds. (*Id.*) Dr. Grau recommended that Arroyo continue with her physical therapy and return for a follow up visit in one month. (R. 387.)

On March 24, 2010, claimant returned to Loyola for a follow-up visit for low back pain, bilateral groin and right lateral hip pain. (R. 384.) She was examined by Dr. Nicholas Ting. (*Id.*) She rated her pain as 9/10. (*Id.*) She stated that she is continuing with her physical therapy and is not taking any medication for her pain. (*Id.*) She described the pain as debilitating and constant. (*Id.*) Dr. Ting's physical examination revealed some tenderness in the low back paraspinals, and an MRI image demonstrated an L4-5 disc bulge. (*Id.*) Dr. Ting recommended that she continue with her physical therapy and return in one month for reevaluation. (*Id.*)

Throughout the month of May, Arroyo underwent various testing with the radiology department at Loyola. On May 10, 2010, Arroyo had an MRI, which showed some L4-5 radiculopathy. (R. 595.) It was also noted that there was "no lumbar malalignment or spondylolisthesis." (*Id.*) Further, "the visualized vertebral bodies [were] normal and demonstrate minimal heterogeneous marrow signal characteristics." (*Id.*) Arroyo underwent additional imaging on May 20, 2010 for L4-5 radiculopathy. (R. 598.) This testing demonstrated no evidence of acute lumbar malalignment. (*Id.*) It also revealed "very mild degenerative changes at L4-5 with broad-based disc bulge without central canal stenosis or effacement of the anterior subarachnoid space." (R. 599.) The radiology report also noted mild loss of disc space at L4-5 and mild to

moderate right paramedian herniated disc. (*Id.*) There was no evidence of additional focal disc protrusion, the lumbar neural formina was within normal limits and the T12/L1 disc space level was normal. (*Id.*) On May 21, 2010, she underwent imaging for her hip pain, and these tests showed "no acute fracture or subluxation." (R. 596.)

Also on May 20, 2010, she went to the emergency room at Loyola. She told Dr. Graziano that she was not taking narcotics at this time due to her fear of addiction. (R. 545.) She complained of "intractable pain which is severe and radiates from her right hip to her right side and chest." (*Id.*) She reported that this pain is worsened by any movement and she reported that she was not able to sit, stand or walk all day. (*Id.*) Dr. Graziano noted that she had 3/5 strength in her right leg, and 4/5 strength in her other extremities. (*Id.*) He also reported no sensation in part of her right leg. (*Id.*)

On July 2, 2010, Arroyo returned for a follow-up visit with complaints of continued pain. (R. 680.) Her range of motion was limited, she deferred a straight leg raise and she had some decreased sensation at the right thigh. (*Id.*) The medical records from this examination state that she had loss of disc space height at L4-5 and signal change consistent with a mild to moderate herniated disc. (R. 681.) An MRI showed marked worsening of her disc herniation. (*Id.*)

On July 12, 2010, she returned to the pain clinic with radiating back pain into her right thigh. (R. 679.) She received an epideral steroid injection for her pain. (*Id.*) At this time, she reported her pain was an 8/10 and she was currently taking ibuprofen. (*Id.*) Her pain after the injection was a 3/10. (R. 680.)

Claimant visited the pain clinic again on January 5, 2011. At that time, she reported that she was still having back and leg pain, which she manages with ibuprofen

and generic Neurontin. (R. 564.) She reported that her pain was an 8/10 and made worse with walking. (*Id.*) At the time of this exam, she had a negative straight leg raise and demonstrated normal strength. (R. 565.)

### 3. Loyola University Physical Therapy Records

On March 3, 2010, Arroyo was referred to physical therapist Elizabeth Russell at Loyola University Medical Center for outpatient physical therapy. Ms. Russell's clinical impression was "acute low back pain." (R. 460.) She noted that Arroyo could not tolerate evaluation procedures, she was unable to sit, and had to remain either standing or laying down. (*Id.*) She recommended that Arroyo use a walker, rather than a cane. (*Id.*) Her plan of care included therapy three times a week for eight weeks. (*Id.*)

On March 12, 2010, Arroyo reported increased pain in her low back and right hip. (R. 362.) On March 15, 2010, she reported continued pain and that she was only able to lay on her right side for a short period of time. (*Id.*) Arroyo also complained of groin pain on her left side, and tenderness with sacral/pelvic palpation on her left side. (*Id.*) She was unable to tolerate some of the exercises. (*Id.*) At physical therapy on March 22, 2010, she reported that her back pain was an 8/10 and she had pelvic pain and occasional back spasms. (R. 363.) She also stated that she was having difficultly using the toilet because of her back pain. (*Id.*) On March 24, 2010, she was showing signs of improvement and was moving in and out of her treatment positions with less difficulty and pain. (*Id.*) However, on March 29, 2010, she reported that her pain had increased to 10/10 and she was having difficultly with the exercises at home. (*Id.*)

On March 31, 2010, she displayed "good effort," her gait and mobility had improved, and her lumbar extension was now neutral. (*Id.*) On April 1, 2010, she reported to her therapist that her pain was 5/10 at the time of her therapy session but that it is much worse at night. (*Id.*) She was able to achieve a reclined position with her back at a 65 degree angle. (*Id.*) On April 14, 2010, she reported continuing pain, but some improvement in moving and walking. (*Id.*) Though she could walk more than 100 feet with ease, she had difficulty maintaining a seated position. (*Id.*) Her extension was 85% limited, and her lumbar flexion and side bending were 75% limited. (*Id.*) She returned on April 21, 2010 with increased pain on her right side and reported continued pain of 8/10 on April 23, 2010. (*Id.*)

Between April and November, she continued with physical therapy and her complaints of pain did not improve. (R. 572-74, 683-710.) During this time, she was provided a raised toilet seat, which did improve her ability to use the bathroom. (R. 684.) On May 25, 2010, she was able to tolerate 60% range of motion of the spine. (*Id.*) On June 2, 2010, she underwent an Oswestry Questionnaire, which resulted in an 84% functional disability score. (R. 684.)

On November 24, 2010, she underwent a physical therapy evaluation. (R. 566.) At this time, her lumbar range of motion was decreased to 75% with pain throughout, and she had decreased weight bearing on the right side. (R. 568.) She also had a positive straight leg raise on both sides. (R. 569.) Her physical therapist also noted that she had "poor tolerance to therapeutic exercise secondary to c/o pain." (*Id.*) As a result, physical therapy was discontinued. (*Id.*)

#### 4.  State Agency Physician -  Dr. Calixto Aquino

On May 7, 2010, Dr. Calixto Aquino, a state agency physician, completed a Physical Residual Functional Capacity Assessment.  (R. 365-72.)  Dr. Aquino stated that Arroyo could occasionally lift twenty pounds, frequently lift ten pounds, stand and or walk (with normal breaks) for a total of at least two hours in an eight hour work day; sit (with normal breaks) for about six hours in an eight hour work day; and withstand unlimited pushing and/or pulling.  (R. 366.)  He stated that she could occasionally climb (including ramps, stairs, ladders, ropes and scaffolds), balance, stoop, crouch, kneel, and crawl.  (R. 367.)  He also noted that there were no manipulative, visual, communicative, or environmental limitations.  (R. 368-69.)

In his assessment, Dr. Aquino stated that claimant complained of radiating pain down her leg with weakness and tenderness, and an MRI showed disc dessication that causes effacement to the anterior thecal sac.  (R. 366.)  Dr. Aquino also stated that Arroyo was in extreme pain, and that there was evidence of decreased sensation, tenderness, weakness and an inability to sit.  (*Id.*)  However, Dr. Aquino opined that due to the acute nature of her injuries, he expected that Arroyo would "retain the ability to perform work activities within the parameters of [the] RFC by 12 months after onset, 2/15/11."  (R. 366-67.)  Dr. Aquino opined that Arroyo's allegations were "credible and consistent with her history and currently physical findings... However, due to the acute nature of the injury and the expected healing, the claimant's allegations would not be as credible 12 months after onset."  (R. 370.)

#### C. Claimant's Testimony

Claimant testified at the hearing that she was 31 years old and has lived in Chicago her whole life.  (R. 49.)  She currently lives in a basement apartment.  (R. 48.)  She has three children, ages 17, 16 and 12, who live with her.  (R. 50-51.)  At the time of the hearing, she was single and there was no one (other than her children) living with her.  (R. 51.)  She had no source of income, although she does receive food stamps and she has a medical card.  (R. 52-53.)  She is not able to pay her rent, and she sometimes receives household supplies donated from her church.  (R. 54.)  She does not receive any child support.  (*Id.*)

At the hearing, Arroyo's attorney clarified for the ALJ that although there are some references in the record to a car accident, she was not actually in a car at the time of the accident.  (R. 52-53.)  She was standing next to her (parked) car when her car was hit by another moving car.  (R. 53.)  She testified that there was no damage to her car and that this incident was not the source of her injury.  (*Id.*)

Arroyo graduated from high school but has had no other formal education since then.  (R. 54.)  She can "somewhat" read and write in English, but she primarily speaks and writes in Spanish.  (R. 54-55.)  She said once she gets beyond words like "the," she has problems with English.  (R. 55.)  Arroyo testified that she no longer has her car, and she asks friends to give her rides when she needs to go somewhere.  (R. 56.)

Arroyo is not working at this time.  (R. 56.)  She has not worked since February of 2010 when her back pain began.  (*Id.*)  Her last job was at Simons Brothers Bakery, where she worked for two years as a cake and pastry decorator.  (R. 56-57.)   A component of her job was also quality control, which included monitoring whether the food was stored properly and cooked at appropriate temperatures, and whether there

14

was any bacteria, garbage or debris around the food.  (R. 58.)  Most of her time at this job was spent moving around on her feet.  (*Id.*)

Prior to her work at the bakery, Arroyo worked for a company called Bilingual Temporary Services.  (R. 60.)  At this job, she worked at different companies, doing assembly and packing work.  (*Id.*)  Her other past jobs included other assembly and packing positions, as well as working as a cashier at a supermarket and a clothing store, and as a welder.  (R. 60-64.)  These positions included both sitting and standing. (*Id.*)

Arroyo testified that she could not work right now due to her debilitating pain.  (R. 69.)  She would have to be hunched over and could not straighten out or lift anything. (*Id.*)  Her back hurts from her neck to her lower back, and she has pain from her hip down to her leg.  (*Id.*)  She testified that this pain is constant.  (*Id.*)  The only thing that helps her pain is lying down on one side or sometimes pain medication.  (R. 70.)  Arroyo testified that her doctor has not recommended surgery for her back pain, and instead, has suggested therapy.  (R. 75.)

Claimant showed the ALJ the two pain medications she is currently taking.  (R. 71.)  Arroyo testified that she went from taking Cyclobenzaprine once a day to taking it two to three times a day.  (*Id.*)  She said that she also takes Gabapentin three times a day because it is the most helpful in managing her pain.  (*Id.*)  In addition, she takes pills that help with her breathing because of her allergies and asthma.  (R. 71-72.)   Her medications cause her to experience dizziness and drowsiness, so she needs to take rests during the day.  (R. 89.)

Arroyo also recently started seeing a psychiatrist and taking medication for depression. (R. 72-74.) The stress of her children, the lack of income and her inability to take care of herself has caused her to feel more depressed. (R. 74.) She has been crying more because her children have to help her with bathing, changing her clothes and daily chores around the house. (*Id.*)

Arroyo testified that the pain in her leg goes down the right side of the right leg and foot. (R. 86.) For a time, the pain was so bad that she could not sit and stand up normally, even to go to the bathroom, and her children had to help her with adult diapers. (R. 87.) When the ALJ asked her why the Walgreen's pharmacy records show that she infrequently filled most of her prescriptions and she never filled her prescriptions for narcotic-strength medication, Arroyo testified that she sometimes did not have money for transportation to the pharmacy, or she did not have the ability to pick up the prescription. (R. 76-77.)

Arroyo is awake early every morning because of her pain. (R. 78.) She does her exercises at home every day, and it takes her about two and a half hours. (R. 75, 78.) She often has to take breaks because the pain is so debilitating. (R. 78.) Other than her exercise and rest, she spends her days walking around her house, or sometimes her children will take her outside during the day. (R. 79.) She does a little bit of cooking or dishwashing if her daughter is there to help her. (R. 80.) She occasionally goes to the grocery store with her children, but they typically do most of the shopping for her. (*Id.*) She also spends some time reading books or the newspaper, and if she is able to and has a ride, she goes to church two or three times a month. (R. 81.) She testified that she can lift about five pounds and can stand for about five minutes if she is able to

lean on something.  (R. 82.)  At the time of the hearing, she was standing (while leaning on a chair) during her testimony for about one hour, but she said she needed to move her legs back and forth to keep herself comfortable.  (R. 83, 88.)  If she were sitting, she would be in more pain.  (R. 83.)  She can sit for about ten to fifteen minutes at a time. (R. 85.)  She can walk less than a block and she has to stop frequently to lean on something because of the pain.  (R. 83.)  She also uses two crutches that attach to her forearms to help her walk, which were prescribed by Dr. Juarez.  (R. 84, 88.)   In addition, Arroyo said she experiences numbness in her fingers when she writes.  (R. 85.)  She is able to zip her coat, brush her teeth, and eat.  (R. 85-86.)

### D. Vocational Expert's Testimony

Vocational Expert ("VE") Cheryl Hoiseth also testified at the hearing.  The VE described Arroyo's past work at the bakery and at the supermarket as light and unskilled, and her work as a packager as sometimes sedentary and sometimes medium, and also unskilled.  (R. 93-94.)  The ALJ asked the VE to consider someone with claimant's age, education, and work experience, with the residual functional capacity ("RFC") to perform light work, except that she can stand for only two hours in a work day and can only occasionally climb, balance, stoop kneel, crouch or crawl.  (R. 95.)  The VE testified that someone with these limitations could not perform any of Arroyo's past relevant work, except for the sedentary packaging job.  (*Id.*)  The ALJ asked the VE to consider someone with the following additional limitations: no constant repetitive pushing or pulling with the right lower extremity, no climbing ropes, ladders or scaffolding, no working on unstable surfaces, only occasionally climbing ramps or stairs,

and stooping, kneeling, crouching and crawling, no constant repetitive reaching or lifting overhead, no extremes, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. (*Id.*) The VE testified that an individual with these limitations could still do the sedentary packaging job. (R. 96.)

The VE also stated that there were other sedentary, unskilled jobs in the national economy that she could perform, such as production worker, inspector, information clerk, order clerk or general office clerk. (R. 96-97.) The VE noted that each job would allow the individual to use a cane and sit or stand at will, and would also include several breaks throughout the day. (R. 97.) She also testified that someone who was only rarely distracted by pain, headaches, or other symptoms could work any of these jobs. (R. 98.) The VE stated that if a person cannot bend, or cannot stand or sit for more than two hours, those limitations would be job preclusive. (R. 99-101.)

## II. Legal Analysis

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis Under the Social Security Act

In order to qualify for DIB or SSI, a claimant must be "disabled" under the Act.  A person is disabled if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In order to determine whether someone is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The

claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, the ALJ followed the five-step analysis. At step one, she determined that claimant has not engaged in any substantial gainful activity since the alleged onset date of February 15, 2010. (R. 16.) At step two, the ALJ determined that claimant has the severe impairments of obesity and back pain. (*Id.*) The ALJ also found that claimant has the non-severe impairments of asthma, ventral hernia, headaches, and depression. (R. 17.) At step three, the ALJ found that claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four, the ALJ found that claimant has the RFC to perform less than the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a). (R. 18.) The ALJ further found that claimant is limited to occasionally lifting and/or carrying ten pounds, that she is capable of standing or walking for at least two hours in a workday and sitting through an entire day, with typical breaks, and that she can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (R. 18-19.) The ALJ found that claimant should not do constant or repetitive pushing or pulling against resistance with her right leg, and that she should not perform jobs that require climbing ladders, ropes, or scaffolds, working on moving or unstable surfaces, reaching overhead, or working around unprotected heights or unguarded hazardous equipment. (*Id.*) Due to her asthma, the ALJ also found that she should not work around concentrated respiratory irritants. (R. 19.)

Additionally, the ALJ determined that claimant would only rarely be distracted by headaches, pain, and other symptoms, to the extent that she would be off-task and unproductive outside of break time. (*Id.*) The ALJ found that claimant is unable to perform any past relevant work. (R. 31.)

Finally, at step five, the ALJ found that considering claimant's age, education, work experience and RFC, she can still perform jobs that exist in significant numbers in the national economy. (R. 32.) Accordingly, the ALJ found that Arroyo has not been under a disability from February 15, 2010, through the date of her decision. (R. 33.)

Arroyo now contends that the ALJ erred in making this determination because: 1) she failed to explain the basis for her RFC determination; 2) she failed to consider evidence that substantiated Arroyo's claims in assessing her credibility; and 3) she insufficiently evaluated the opinion of Arroyo's treating physician.

### 1. The ALJ's RFC Determination Was Supported by Substantial Evidence

Arroyo first argues that the ALJ's determination that she is capable of performing sedentary work with additional limitations is not supported by the evidence. She contends that in making this RFC determination, the ALJ improperly ignored opinions, evidence, and testimony regarding Arroyo's ability to maintain a seated position without constant pain. She also argues that the ALJ disregarded medical evidence regarding her headaches.

We disagree that the ALJ's RFC determination is not supported by the evidence. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not

dismiss evidence contrary to the ALJ's determination." *Corbin v. Colvin,* No. 11-cv-3361, 2014 WL 2781763, at *8 (N.D. Ill. June 19, 2014). Here, we find that the ALJ carefully considered the medical evidence and claimant's testimony, and her RFC determination was thorough and fully grounded in this evidence. The ALJ took into account those portions of claimant's testimony that she found credible. Further, she considered that claimant experienced pain after sitting for a long time when she verified that the jobs for which claimant was eligible allowed her to sit or stand at will. *See, e.g, Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) ("[A] job in which [claimant] could sit or stand 'as needed' would necessarily encompass frequent sitting and standing."); *Lopez v. Astrue*, No. 10-cv-8024, 2012 WL 1030481, at *10 (N.D. Ill. Mar. 27, 2012) ("A sit/stand option at will is frequently used in the Seventh Circuit, demonstrating that an 'at will' option is a sufficient specification of frequency of the individual's need."); *Corbin,* 2014 WL 2781763, at *9 (ALJ's RFC determination was adequate despite complaints of pain with sitting when claimant would be allowed to sit or stand at will.) Therefore, we find that the ALJ properly accounted for the medical evidence regarding claimant's difficulty with sitting.

Arroyo also argues that the ALJ disregarded her headaches in making her RFC determination. Specifically, she argues that the ALJ did not adequately explain her finding that Arroyo would be distracted "only rarely" by headaches. (R. 19.) Again, we disagree. In her description of Arroyo's non-severe impairments, the ALJ discussed the fact that Arroyo complained of headaches and reported some improvement with medication, although she infrequently filled her prescriptions. (R. 17.) The ALJ also noted that Arroyo reported having suffered from headaches throughout her adult life,

apparently while she was still working. (*Id.*) In support of her argument, Arroyo relies on *Indoranto v. Barnhart*, 374 F.3d 470 (7th Cir. 2004), where the court found that the ALJ did not adequately discuss how the claimant's chronic severe headaches and blurred vision affected her ability to work. Here, the ALJ incorporated evidence of Arroyo's headaches into the RFC determination and hypothetical questions to the VE. The medical evidence reflects that Arroyo suffered from an occasional headache and was prescribed medication, which was not always filled. We find that her determination that Arroyo's headaches would only cause an occasional distraction was supported by the evidence. *See Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013) (holding that the ALJ properly considered occasional migraine headaches in finding that claimant was capable of work). Accordingly, we find that the ALJ sufficiently articulated her findings with regard to claimant's headaches.

In sum, we disagree with claimant's argument that the ALJ ignored her complaints and the medical evidence in reaching her RFC determination. Indeed, she relied on this evidence when she disregarded Dr. Aquino's RFC finding that claimant could perform light work. She also accounted for Arroyo's complaints when she added restrictions to the RFC determination and limited her to sedentary work with several additional limitations on lifting, reaching, standing, walking, sitting, pushing/pulling with the right lower extremity, and climbing. Although this RFC determination is contrary to Dr. Juarez's opinion that Arroyo could not do any work, the ALJ was thorough in her reasoning for disregarding this opinion (as discussed in more detail below).

### 2. The ALJ Reasonably Weighed the Treating Physician's Opinion

Arroyo next claims that the ALJ insufficiently evaluated the opinion of her treating physician, Dr. Juarez. Generally, an ALJ gives the opinion of a treating physician controlling weight because they are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870 ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances") (internal citations omitted). However, a treating physician's opinion is only entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). While different medical opinions must be considered in evaluating a claimant's medical impairments, "the final responsibility for deciding the issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). The ALJ is free to discount the opinion of the treating physician so long as he provides good reasons for doing so. *Clifford*, 227 F.3d at 870.

In addition, "[t]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances." *Hofslien*, 439 F.3d at 377. Among the factors that the ALJ should consider in order to determine the weight of the treating physician's opinion is the nature and extent of the treatment relationship (20 C.F.R. § 404.1527(c)(2)(ii)), and the specialization of the physician providing the opinion (20 C.F.R. § 404.1527(c)(5)). Generally, the ALJ will give more weight to the opinion of a physician when those opinions relate to a medical issue in his or her area of specialty, as well as opinions relating to medical issues for which the physician has specifically

treated the patient. *See* C.F.R. § 404.1527(c). The ALJ does not need to accept an expert witness's opinion that is outside her field of expertise. *Schmidt v. Apfel*, 201 F.3d 970, 973 (7th Cir. 2000). In addition, although the ALJ must always give "good reasons" for her determination as to the amount of weight afforded a treating physician, 20 C.F.R. § 404.1527(c)(2), the Seventh Circuit has held that an ALJ's decision to discount a physician's opinion is subject to a very deferential standard of review. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). As long as the ALJ "minimally articulated" her reasoning, a reviewing court must allow that decision to stand. *Id*

Here, we find that the ALJ sufficiently articulated good reasons for not giving controlling weight to the opinion of the treating physician. Although Dr. Juarez opined that Arroyo was entirely incapable of performing any kind of full-time work, the ALJ found that her opinion was not entitled to controlling weight for several reasons. First, the ALJ noted that the RFC form that Dr. Juarez completed was based primarily on Arroyo's reported symptoms and subjective complaints. Her medical notes also include many references to Arroyo's subjective complaints about pain, without much objective medical evidence. The ALJ acknowledged that Dr. Juarez had a history with Arroyo, but also noted that Dr. Juarez was not a neurologist or a specialist in back pain. In addition, much of the objective medical evidence does not disclose the kind of lower back abnormalities that would support a completely disabling injury. After Arroyo underwent a number of MRIs, physicians at Loyola found only "mild," "subtle" or "mild to moderate" abnormalities. (R. 344-46, 420, 599, 681.) A few other tests revealed normal results or no acute injury. (*See, e.g.,* R. 595, 599.)

The ALJ also discounted the opinion of Dr. Juarez because that opinion was apparently based in large part on Arroyo's subjective complaints of pain. Notably, Dr. Juarez was under the impression that Arroyo was not obtaining any relief from Norco and other medications, when in fact, those prescriptions had not been filled. While it is true, as Arroyo argues, that other evidence in the record demonstrates back pain and a diagnosis of a herniated lumbar disc, the ALJ was reasonable in finding that the objective evidence does not necessarily support Dr. Juarez's finding of debilitating and disabling pain.

In this case, the ALJ provided a very thorough discussion of the medical evidence at issue. Although she did not discuss every piece of evidence in the section addressing the weight afforded to Dr. Juarez, we find that the ALJ has adequately articulated her reasons for not giving controlling weight to Dr. Juarez's opinion.

### 3. The ALJ's Credibility Determination Is Not "Patently Wrong"

Finally, Arroyo contends that the ALJ erred in assessing her credibility. Because the ALJ is in a superior position to judge the credibility of a claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, although "credibility determinations are entitled to special deference, ...the ALJ is still required to build an accurate and logical bridge between the evidence and the result." *Pratt v. Colvin,* No. 12 C 8983, 2014 WL 1612857, at *6 (7th Cir. 2014) (*quoting Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010)). An ALJ must "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it." *Id.* (*quoting Martinez v. Astrue,* 630

F.3d 693, 697 (7th Cir. 2011)).

The ALJ must also comply with the requirements of Social Security Ruling 96-7p when assessing the credibility of statements. SSR 96-7p, 1996 WL 374186 at *4; *Brindisi*, 315 F.3d at 787 (*citing Steele*, 290 F.3d at 942). SSR 96-7p requires that the "reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p, 1996 WL 374186, at *4. The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support claimant's credibility. *Lopez*, 336 F.3d at 539-40. Indeed, SSR 96–7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Corbin,* 2014 WL 2781763*,* at *5 *(citing Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)).

Here, the ALJ sufficiently articulated her basis for finding that Arroyo's testimony and complaints lacked credibility. First, the ALJ noted that Arroyo was not truthful about her use of prescription medication. On a number of occasions, she reported to Dr.

Juarez that she was taking Norco and other medications, when in fact many of those prescriptions had not been filled. Throughout her medical records, Arroyo is said to have continued pain despite reported use of narcotic strength pain relievers. This not only demonstrates that she was not honest in her communications with her treating physician, but also that her pain was likely not as severe as she claimed since she was willing to forego her prescribed medications. On one occasion during the relevant time period, Arroyo told a physician that she was not taking Norco because she was afraid of addiction. However, when asked about her failure to fulfill the prescriptions at the hearing, she provided a different reason: she testified that the ability to get to the pharmacy was sometimes a problem for her. But this does not explain why she was not honest with Dr. Juarez when she stated that she was not obtaining relief from Norco. As a result, we find that the ALJ appropriately relied on this factor in making her credibility determination. *See Williamson v. Astrue,* No. 08-cv-3906, 2010 WL 2858834, at *10 (N.D. Ill. July 16, 2010).

In addition to the prescription records, the ALJ noted that on some occasions during the relevant time, Arroyo did not report the extreme, disabling pain that she claims to have suffered. For example, on September 15, 2010, she visited the emergency room for a urinary tract and respiratory infection but made no mention of extreme back pain, nor was she observed to have any disabling pain or functional limitations. The ALJ also believed that Arroyo exaggerated her inability to speak English, based on circumstantial evidence in the record which contradicts her testimony that she can read, write or speak only little English. Although the issue of whether she can speak English is not directly relevant to her disability claim, her mischaracterization

here reflects poorly on her overall credibility.

Lastly, the ALJ also found that Arroyo's subjective complaints of severe pain were not supported by the objective medical evidence, such as multiple MRIs showing only "mild" or "mild to moderate" abnormalities. While the absence of objective medical evidence cannot alone justify an adverse credibility finding, this factor, coupled with the other circumstantial evidence discussed above, leads us to conclude that the ALJ's credibility determination was not "patently wrong."

Claimant argues that the ALJ failed to consider her testimony regarding daily activities in making her credibility determination. However, the Seventh Circuit has held that an ALJ "is not obliged to believe all of a claimant's testimony...Applicants for disability benefits have an incentive to exaggerate their symptoms and an [ALJ] is free to discount the applicant's testimony on the basis of other evidence in the record." *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006). Moreover, it is well-settled that the ALJ is "in the best position to determine [a claimant's] truthfulness and forthrightness." *Skarbek v Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). Here, the ALJ did consider her daily activities in making her determination that Arroyo could perform only sedentary work with additional limitations. We find that the ALJ was reasonable in not crediting Arroyo's testimony about the extent of her disabling pain and that she properly concluded that the limitations Arroyo alleged were more restrictive than those supported by the objective medical evidence. Overall, the ALJ adequately built a logical bridge between the evidence and her conclusion, and we do not find that her credibility determination was "patently wrong."

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted. It is so ordered.

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 18, 2014**